### CHELSEA.

One, who is duly returned a member, has a right to take a seat and act as such, even though he is not duly elected, and ought not to have been returned.

If the choice of a representative is stated in the warrant for a town-meeting, the town may properly entertain any motion in relation to that subject; and a motion to reconsider the vote of a former meeting, to send a representative, is incidental thereto, and is in order, before the poll is opened.

An election, which takes place after a vote that the meeting be dissolved, and a declaration thereof made to the meeting by the presiding officer, is void.

IN the course of the proceedings which occurred previous to the organization of the house, it was stated that Hosea Ilsley, returned a member from Chelsea, in virtue of a certificate of election, signed by the selectmen, and who had taken his seat, and participated in the proceedings as a member, was not legally elected, and ought not to have been returned; and a motion was made to amend the order,—relative to the right of the two claimants from Whately, and prohibiting them from exercising the functions of members, until their several claims had been investigated by a committee and decided upon by the house,—by the insertion therein of the name of the member returned from Chelsea,

[1] 65 J. H. 273.

with a preamble in these words[1],—" And whereas Hosea Ilsley, who has been qualified as a member from Chelsea, and who appears by the records of said town not to have been elected, has taken his seat as a member ;"—but this motion was decided in the negative, 172 to 176.

The election of Mr. Ilsley was subsequently controverted by George C. Fairbanks and others,[2] on the ground, that the election took place after the meeting called for the choice of a representative had been dissolved.

It appeared by the petition and evidence in the case, that at the meeting of the town of Chelsea, on the 14th of November, 1842, it was voted to send a representative to the general court, but no choice was made, and the meeting was dissolved. A new meeting being called and held on the fourth Monday (the 28th day) of November, it appeared by the record of the meeting, that it was first voted to reconsider the vote, whereby the town voted to send a representative to the general court, and then that the meeting be dissolved.

The petition being referred to the committee on elections, the petitioners contended, at the hearing, that the town when assembled in town-meeting was present therein in their corporate capacity, whether the persons constituting the meeting were few or many, and was fully prepared to act upon all the matters specified in the warrant; that the meeting of the 28th was a separate and independent meeting, not at all bound by the vote at the meeting of the 14th to send a member, which was virtually reconsidered and reversed by the dissolution of that meeting without effecting an election; that the record being conclusive of itself on all matters previous to the dissolution, and the fact of a dissolution being granted, it would not be competent for the committee to go behind that recorded fact, and examine into the facts which took place after the dissolution.

The sitting member, admitting (for the purposes of the inquiry) the positions taken by the petitioners, contended, and introduced evidence to prove, that the alleged dissolution, being

[1] 65 J. H. 12.        [2] Same, 23.

obtained by uproar, fraud, tumult and violence, was illegal; and that, in fact, the meeting was not legally and properly dissolved, until after he had been declared elected.

Much evidence was given on both sides, and stated at length by the committee, as a part of their report, relative to the point in question; but as the house appear to have decided, upon the evidence, that the dissolution of the meeting was not effected in the manner alleged by the sitting member; it will only be useful to present so much of the testimony, as may be necessary to explain the report of the committee, and the views of the minority as presented by them. For this purpose the evidence of two of the selectmen will suffice.

The testimony of Ebenezer Currier, who was chairman of the selectmen, and presided at the meeting of the 28th of November, was in part as follows:

" Prayers having been offered,—a motion was made to reconsider the vote of the former meeting, which was to send a representative. Several persons wished to speak on the question, and great disorder ensued; there was no constable present, and I at last put the question and decided that the vote was reconsidered. A motion was then made that the meeting be dissolved. The question was put, and one or more persons wished to speak. There was so much disorder and cries of question, that they could not be heard, and it was decided by me, that it was a vote to dissolve the meeting. One of the selectmen said, ' It was not right; that persons ought to have a right to speak,' and we concluded that a vote taken under such circumstances of disorder was illegal. We did not say so, however, to the meeting, except so far as that we declared, that a majority of the selectmen had determined to receive votes for a representative.

Immediately on my declaring the meeting dissolved, and while Mr. Cummings and myself were conversing together as above, the clerk had proceeded to present the box and call for votes for a moderator. No part of the warrant was again read, at that time; the whole warrant had been read at the beginning of the meeting. I think I heard the vote to dissolve the meeting doubted; the house was upon that divided, but not counted; for the appearance on inspecting the sides was as two to one. No measures were taken to see if those voting on either side were legal voters. It was again declared to be a vote.

It was about from fifteen to thirty minutes from the time that I last declared the meeting to be dissolved, to the time when I announced that a majority of the selectmen had concluded to receive the ballots for representative.

I cannot say if there was a division of the house on the question of reconsideration, there was such confusion that the gentlemen claiming a right to speak could not be heard,—I mean that it was so great that the inhabitants generally could not hear what was said. I suppose they heard the motions when they were put, though I cannot say they understood them. I put the question, ' Shall the meeting be dissolved ?' people attempted to speak, and then there were cries of ' question.' These

would cease, but if any one attempted to speak, they were renewed. Thus it was still, when I said ' please to manifest,'—and when it was doubted, there were no cries or clamor, to my recollection. Mr. Cummings spoke to me, as I have stated, private-ly, at the time ; there was no other public or private protestation against the vote.

I think it was after the clerk had declared that a moderator was chosen, that I an-nounced our determination to receive votes. I can't say that any time was fixed for keeping the polls open to receive votes for moderator. The moderator had not come into the desk, and the selectmen had not left it. I had not left the desk from the beginning of the meeting until a representative was chosen. The town business was suspended, while we received votes for representative. I have no recollection of any attempt at that time, at a speech, or of any opposition to our proceeding ; subse-quently, a kind of protest signed by about sixty names, was placed on our table. I did not pay any attention to see if any persons left the house during the balloting for moderator. At the time the house was divided, the number of persons present was not less or more than one hundred and fifty.

The clerk proceeded to collect votes for moderator without consulting me ; he did it, I presume, at his own instance. The vote for moderator was not large ; the result of the ballot for representative, as announced, was, whole number two hundred and twenty-one. For Mr. Hosea Ilsley, one hundred and twenty-nine,—for Abner Gay, seventy-five, and seventeen scattering. I declared the result. I did not stop to see if the count was true. I can't say that the motion to reconsider was doubted,—there was a division on one vote, and my impression is that that was on the motion to dis-solve. I cannot say about a committee's having been chosen to wait on the modera-tor and see if he would accept, or whether that was before the selectmen resumed action or not.

I did not object, and I know not of any one's objecting to the clerk's proceeding to receive ballotings for moderator ;—I think I spoke something to the clerk about it, but don't remember what. My reasons for agreeing to receive ballots for representa-tive were, that a number of persons came and presented votes, and claimed a right to deposit them, and also the votes had been taken amidst such noise and confusion, that I thought it not right. I recollect no threatening or intimidating language addressed to me, to induce us to receive votes. I thought Mr. Gould pretty anxious to vote.

I couldn't keep order ; I could see no constable ; the people would be quite still while I put the questions, but if any one attempted to speak, there would be cries of ' question.' I have no recollection that Mr. Bates, the constable, was present. I did not ask for one. I remember thinking about one. Mr. Beatty, the town clerk, was present, sitting by me, but I had forgot he was a constable. I did not desire to hurry proceedings. I did not, by word or act, attempt to preserve order ; I can't say if there were any unsuccessful attempts to speak before the hand vote on the ques-tion of dissolution.

I think there were addresses made to me as chairman. I think Mr. Nowell address-ed me before the hand vote on the dissolution. I don't know that Mr. Nowell was in the room before the balloting for moderator."

### Daniel Cummings testified as follows :—

" I am, and was in November, a selectman of the town of Chelsea. We went into the desk about half past twelve, the warrant was read, and prayers were offered, and we were about getting the list of voters ready, when a motion was made to reconsider the vote of the former meeting. It was seconded, and put very quick and carried. Immediately a motion was made to dissolve the meeting,—the vote was taken and

declared. It was a hand vote. It was doubted. The house was divided, not counted. We were satisfied there was a majority for dissolving the meeting, by their appearance. All this took place very soon after the meeting was opened. No means were taken to ascertain if the persons voting were qualified voters, nor were there any exceptions taken to any one who voted. Two or three persons attempted to speak. I can't say that any person attempted to speak on the question of reconsideration. Two persons did on the last question, and perhaps more. There was so much noise round the room, and the question was put so quick that there was no chance; still I do not think the chairman announced or named any one as wanting to speak. I saw persons get up and take off their hats, and say, ' Mr. Chairman !' One man, (I think it was Mr. Nowell,) got on some steps, that were in the room, and said so, but the chairman did not respond to him. They (the meeting) would cry ' question! question !' and would not let him speak. I cannot say that the chairman attempted to bring the meeting to order, and give persons a chance to be heard. The question was put amidst the noise. They would stop and hear the chairman, but, if any body else attempted, they would raise the cry of question. In fifteen or twenty minutes after the declaration of the dissolution, the box was held for votes for representative. On this step the three selectmen did not have what might be called a consultation together. I spoke to the chairman about it, and I saw him turn and speak to the others. I expressed my opinion that it was wrong to dissolve the meeting, that the citizens had been called together to vote for a representative, and ought to go on; that there was nothing in the warrant about reconsidering, and that therefore the proceedings were illegal. My only reason was, that I thought it was not common sense to call the people together to choose a representative, and then dissolve without choosing one. I thought, too, that there was no opportunity for people to express their minds and opinions. I said so to the chairman. Previous to the last motion's being put, I said so to him, and he made me no reply.

I heard nothing said about a constable. One man came, and demanded as a right to put in a vote for representative. I cannot tell whether any citizens quit and went away after it was declared that the meeting was dissolved. Some were going out and in ; there were other rooms in the building, and the matter of the town-hall was in the warrant yet to be acted upon.

The clerk figured up the countings, and returned or handed them to the chairman, and he stated the result to the meeting. Two hundred and twenty-one was the whole number of votes, I think. I counted and gave in seventy-three votes. No one counted after me ; there are about five hundred and eighty voters on our list.

No votes had been thrown into the box for representative before the chairman declared that we were ready to receive them. Mr. Currier had, and used, the check list. I cannot say that I heard any one express a desire to speak before the putting of the hand vote to dissolve. There were cries of question, I am sure, before that vote was doubted. There was considerable noise in the room, stepping about, and people rushing up before the hand vote was put on the dissolution motion.

I do not recollect that the clerk read any part of the warrant after the motion to dissolve was put. He proceeded to receive the ballots for moderator, and I did not dissent, and I don't know that any body did. Mr. Abner Gay was declared elected moderator, and a committee was appointed to go for Mr. Gay. We had begun to receive ballots for representative before I knew that Mr. Gay had arrived. I am sure he had not attempted to act as moderator."

The conclusion of the report was as follows:—

"After the testimony was closed, the case was argued by Messrs. Brigham and Hallett, the petitioners contending that the subject of the choice of a representative to the general court being stated in the warrant, it was competent at any time before the poll was opened, and after the reading of the warrant, for any voter to move a reconsideration of the vote adopted at a former meeting for the choice of representative, or to move that the meeting be dissolved; the petitioners contended that this is the corporate right of the town, and that the decision of these questions in the affirmative must, of necessity, be conclusive upon the town; they also further contended, that the vote of dissolution having been declared to be carried, all proceedings afterwards were null and void, and that it was not in the power of the selectmen to resuscitate the meeting.

The counsel for the sitting member, on the other hand, contended, that it was not competent for the town to reconsider the vote passed at the former meeting, because the matter of reconsideration was not stated in the warrant, and he further contended, that the proceedings were illegal, because fraudulent, and did not allow a fair discussion and expression of opinion.

In reference to the first point, the committee are unanimously of opinion, that the matter of choice of representative being stated in the warrant is amply sufficient to entertain any motion in relation to that subject, and that the matter of reconsideration is an incidental question, which was perfectly in order, under the warrant, before the poll was opened.

The committee are also of opinion, that the right to reconsider is a corporate right of the town, and that, if that motion prevailed, or if the town had voted not to send a representative, the action of the town would have been legal; and a dissolution of the meeting, after such proceedings, would have effectually precluded a choice of representative on the 28th November.

But the case presented by the sitting member is one, which calls for the grave consideration of the committee and the house, and the correct decision of which, though not to be

arrived at without some difficulty, is of the utmost importance, and ought earnestly to be desired by members of all parties; as the decision of 'the Chelsea case' will doubtless be referred to in time to come, as a very important precedent in reference to other cases at all resembling this.

It is admitted by the sitting member, that a motion was made for reconsideration and for dissolution; and it is contended by the petitioners that these several motions were carried, and so declared by the chairman; but it is urged by the sitting member, that owing to the whole course of proceeding at the meeting on the 28th, by which said alleged dissolution was effected, the votes of reconsideration and dissolution are to be regarded as a nullity, and that the selectmen, in receiving votes for representative, and declaring the election, and certifying the result to the house of representatives, did no more than it was their duty to do under the laws of this commonwealth.

Two questions are thus presented for the consideration of the house : —

1. Can a state of things be supposed, which would justify the selectmen of a town in proceeding to receive votes for representative, after a vote of dissolution has been declared by the presiding officer to be carried?

2. If such a state of things can once be supposed, does the evidence in the present case exhibit such a disorderly and riotous proceeding, as justified the selectmen in receiving votes for representative subsequently to the alleged dissolution?

On the first point, a majority of the committee are of the opinion, that although the case must be a very strong one which would justify such a course on the part of the selectmen, yet that such a case is supposable.

A free and full expression of the popular will, upon matters submitted for the action of the voters, is essential to the continuance of free government, and this will is expressed both by speaking and voting; thus it is conceded, that a fair vote, by an undoubted majority on a show of hands, or by a poll of the house, should be conclusive upon the selectmen and the voters themselves.

But the right to speak, by way of expressing our own opinions, and with a view to influence others, by arguments addressed to their consideration, is as important as the right to vote ; and a result, obtained by preventing such an expression of the will of the legal voters present at a meeting, is virtually a fraud upon them, whether so intended or not, and ought to be treated as a nullity.

If a motion should be regularly made to dissolve a meeting, and the chairman should, without good cause, refuse to entertain the motion, or to submit it to the meeting, it would undoubtedly afford good ground for a petition against the seat of a member, who should be elected at such meeting subsequent to such refusal.

If, then, there is a determination manifested by four-fifths of a meeting that the remaining one-fifth shall not be heard upon a question, and the chairman, whether by fraudulent connivance or through timidity or imbecility, allows himself to be used by this majority to overwhelm, stifle and effectually prevent the utterance of a single word of debate on the question, or of remonstrance against the proceedings, or of argument and reasons in favor of an opposite course of proceeding, shall a vote, obtained under such circumstances and in connection with such suppression of debate, be regarded as valid ? especially if, upon reflection, the presiding officer himself, who has been used to secure such a vote, virtually declares it to be a nullity and acts accordingly ?

The committee cannot believe that the house will assent to the exercise of such power, or say, by their action, that a dissolution obtained under such circumstances is anything more than a nullity.

To hold an opposite opinion is to maintain that it is competent for selectmen, or even for one selectman without the advice or consent of his colleagues, to dissolve any meeting called for the election of representatives, even though every man in the hall, with the exception of the chairman and the man who makes the motion, is acting under misapprehension ; and thus a town may lose its representation for a year, past remedy,

61

simply by the perfidy or the ignorant action of the chairman of the selectmen.

As to the second point of inquiry, viz.: were the proceedings at Chelsea, on the 28th of November, such as justified the selectmen in receiving votes for representative, notwithstanding the alleged vote of dissolution; a majority of the committee entertain the opinion that they were.

The evidence, upon which this opinion is founded, is fully reported to the house, and it is unnecessary to recite it in this connection.

It appears, that it was the intention of a number of the democratic party, to prevent if possible any attempt to elect a representative on the 28th, because they were not satisfied with the caucus candidate. Great efforts were made to procure a full attendance, at the time specified in the warrant for the opening of the meeting, as appears by the arrival of the omnibus loads of voters at an early hour; and the clerk was severely censured for dilatoriness, on his arrival at the hall, and the meeting was opened at a period unusually early, as appears from what is proved to have been the custom of the town.

These circumstances, however, though taken in connection with subsequent events, they show that the manner in which the alleged dissolution was effected was a matter of concert and predetermination, yet in themselves considered, would not form any adequate ground of objection to the supposed dissolution. Indeed, far be it from the majority of the committee to deny the utmost latitude of the right of meeting at the democratic or any other head quarters, and discussing either the claims of candidates, or the expediency of foregoing the right and privilege of town representation.

But when these previous discussions give rise to a course of proceeding, such as took place at Chelsea, at which a warrant was read—a prayer made—a reconsideration moved and carried—the house divided—a motion for a dissolution made, and asserted to be carried, and the house divided; and all this effected in from fifteen to twenty minutes of time—and no per-

son allowed to speak, though many attempted to do so, but were prevented by the meeting, by means of the cries of 'question,' which ceased only when the chairman stated the question, and commenced again whenever 'Mr. Chairman' was heard; and when no attempt was made by the chairman to produce order, or to secure an opportunity for a word of debate, by a single person who desired it; and, (to pass over intervening events,) when we find a proposition deliberately made in a meeting, organized by a chairman and secretary, (at which a protest was drawn up and signed during the balloting for representative,) to throw a handful of votes into the ballot-box; then do we regard these previous movements as part of an extended plan, which was to be accomplished by the use of means that are highly censurable, and which, if countenanced and imitated, must eventuate in the overthrow of free government.

Seeing the course of the meeting, some of the voters of both political parties were earnest in asserting their rights as freemen, and well they might be, as long as they expressed their sentiments, and did not attempt to remedy evil, by the violation of law.

The selectmen, on consultation, and before the person who was said to be chosen moderator came into the box or attempted to act, became satisfied that they ought to proceed under the warrant, and receive votes for representative; they did so, and the record of this part of the meeting, though made at the same time and on the same memorandum book, with the other proceedings, was not copied by the clerk into the volume of town records, but was distinguished by the word 'remarks' being placed over it, some days after the meeting. This record shows that Mr. Ilsley was elected by a clear majority; 116 being the number necessary for a choice; and although his vote is stated at 129, it appears by the testimony of two unimpeached witnesses, that there was evidently a mistake in the declaration of the count, and that he probably received many more votes, perhaps in all 231. The clerk himself admits, that he might have made a mistake in giving his

count, which indeed is the only way of reconciling the error, as there is nothing in the evidence, or in the appearance of the clerk, to lead the committee to suspect for a moment, that the mistake, if committed, was intentional.

Under these circumstances, and in view of the evidence herewith submitted, the committee recommend that the petitioners have leave to withdraw."

A minority of the committee, (Messrs. *Thomas*, *Russell*, and *Williams*,) dissenting from the opinion of the majority, as expressed in the foregoing report, presented their views to the house in a minority report, as follows :—

" The sitting member claims to have been elected at a meeting of the citizens of Chelsea, held on the 28th of November. The town record, which was produced and sworn to, by the town clerk, shews no such election, but, on the contrary, that prayers having been offered, and the warrant read, a vote was passed to reconsider the vote of a former meeting, by which the town voted to send a representative, and then it was voted to dissolve the meeting.

The sitting member, with the leave of the committee, assumed to prove that the record was fraudulent, in respect to the votes to reconsider and dissolve. Of the success of this endeavor, the house will judge by the evidence. Every witness on both sides, who testified to that point at all, testified, that after prayer and the reading of the warrant, a motion was made and seconded to reconsider the vote passed at a former meeting, by which the town voted to send a representative ; that this motion was distinctly put to the meeting by the presiding selectman, and by him declared to be a vote, two-thirds present, at least, voting in the affirmative ; that a motion was then made to dissolve the meeting, which was also put to the meeting by the same officer, and by him declared to be a vote, two-thirds, at least, voting in favor of it. The testimony further shows, that both of these votes were made certain by a division of the house, and that they were fully understood by the meeting.

The business of the town clerk, in the judgment of the un-

dersigned, is to record what is done in town-meeting; and as in this case, there is the fullest proof that these votes were actually put, carried and declared, we are unable to perceive how it can be charged, with any show of propriety, that the record is fraudulent. The record simply asserts a fact; that fact is borne out by the evidence. Where, then, is the fraud? The question of the competency of the town to pass upon motions is one thing, the question whether or not the town passes upon motions is another thing; and the latter is the only thing with which the record has any concern. The quarrel of the sitting member, then, is not with the record. The record cannot be fraudulent, because what it alleges was done, was done.

It is admitted by the majority that the town was legally assembled; that the matter of choosing a representative was sufficiently stated in the warrant to authorize the town to entertain any motion in relation to that subject; that the motion to reconsider the vote of a former meeting by which the town voted to send a representative, was within the competency of the town to pass upon; that such a motion was made, and made at the proper time; and that, 'if that motion had prevailed, or if the town had voted not to send a representative, without reconsidering the former vote, the action of the town would have been legal, and a dissolution of the meeting, after such proceedings, would have effectually precluded a choice of representative.' The only point in dispute, therefore, between the majority and the undersigned is, whether, in the language of the majority, the motions to reconsider and dissolve 'prevailed.' And on that point the undersigned believe that the house will not want evidence to determine.

In the view of the undersigned, here is the end of the case. The town voted to dissolve the meeting; it had a right so to do; and whether for a good reason or a bad one, whether hastily or deliberately, so that the vote was made certain, there was the end of it. No subsequent act could give it vitality. Up to that time no representative had been chosen.

But here the majority interpose a new theory, certainly new

to the undersigned. They gravely tell the house, that these votes are to be regarded as a nullity, and what took place afterwards was perfectly legal and proper. And the reason they allege for this conclusion is, that 'the whole course of proceedings on the 28th' was exceptionable. The minority think with the majority, if indeed there be any virtue at all in precedents, that the correct determination of this question is 'very important,' as forming a 'precedent for the decision of cases in future,' and for this reason the minority regret that the majority had not been a little more explicit in their statement; 'the whole course of proceedings,' being a very indefinite expression.

On looking, however, to the statement of the argument of the counsel for the sitting member, as set out in the report of the majority, the undersigned find that the reason urged for this conclusion is, 'that the votes were obtained by uproar, fraud, tumult, and violence.' As the undersigned are not able to appreciate the difference between 'uproar' and 'tumult,' they may, perhaps, be pardoned, if in considering this branch of the subject, they reduce these four specifications to three. The undersigned, would, however, first premise a word as to this new view of the majority. The dispute between us is still one of fact, namely, whether the votes above referred to 'prevailed.' And we had supposed that a vote of dissolution was none the less a fact for being obtained by fraud, tumult, or violence. If these votes had 'prevailed,' say the majority, they would have effectually precluded the choice of a representative, but then they were obtained by uproar, fraud, tumult and violence. The undersigned are unable to understand how a vote can have 'obtained' and not have 'prevailed,' for we had supposed that both words denoted the same fact, and the fact being admitted, we repeat, there was an end to the meeting.

If the distinction claimed by the majority be real, it can only be the pulling down one's house with, or without the leave of the law. In either case the building is destroyed, though most of the materials remain.

Besides, suppose a vote taken amidst confusion is to be re-

garded as a nullity. Is not every vote taken under the same circumstances to be regarded as a nullity also? And if so, what becomes of the claim of the sitting member? If it be unlawful to reconsider a vote by fraud, tumult and violence, can it be lawful to elect a member of this house by the same means?

But how stands the fact about the fraud, tumult and violence? The house will bear in mind, that in this case, the burden of proof is on the sitting member. He claims to prove the record a fraud, and impeach the oath of the town clerk. He must then make out his case.

1. As to the *fraud*, where is the proof of it? Does it consist in what was done before the meeting or at the meeting? If before the meeting, in what act? Was it a fraud in Haskell to get people to go to the meeting early? Was it a fraud in the people to agree to go to the meeting with a determination to vote not to send a representative? though the evidence negatives the idea that they went there with that determination. The majority, it appears to the undersigned, conclude themselves against this argument, by admitting that the town was legally assembled and competent to act upon the motion, when it was put.

If it consists in what took place at the meeting, in what act? Was it a fraud in Haskell to make the motions to reconsider and dissolve? or in others to second the motions? or in the chairman to put them to the meeting? or in the people to vote for them? Was it a fraud in Gleason to attempt to speak to the question? or in others to call to order, when, in their judgment, he was speaking out of order? or in the chairman, that he did not wait longer to hear him? If in the chairman, then, the undersigned submit, his testimony ought to have been voted out of the case, for he was the witness of the sitting member, and by a rule of law known to none better than to the majority, ought not to be held to criminate himself.

In respect to the alleged denial of the right to speak, the undersigned observe, that the testimony of Mr. Blaney is clear to that point: ' Mr. Gleason attempted to speak before the

chairman stated the question, on the motion to reconsider. He had not then stated the question. The chairman said, " I'll state the motion, gentlemen, and you can speak afterwards." I did not hear any one speak afterwards, before the vote was taken. The chairman said it would be open for debate after he had stated the question, or something to that effect.' The testimony of Mr. Gleason himself is, that he merely said ' Mr. Chairman.' And he and Mr. Haskell agree in the fact, that immediately after he made this call upon the chairman, Haskell went to him and, requesting him not to speak, called off his attention. The only person, whom the selectmen can identify as having addressed them on either question, was Mr. Nowell; and the proof is conclusive, that Mr. Nowell was not in the hall till the meeting had been declared to be dissolved. This appears from the testimony of Nowell himself, as well as from others.

Mr. Currier, the chairman, swears that he cannot say there were any attempts to speak on the hand vote for dissolution. And Mr. Cummings, the other selectman, has no recollection that any person attempted to speak on the question of reconsideration. Mr. Nowell is the only one he can recollect who addressed the chair.

Mr. Darius A. Martin, much the swiftest witness introduced by the sitting member, testifies that there were three or four persons attempted to address the chair, and soon after he magnifies them into a dozen; but he states expressly, that he can identify no one except Gleason, who attempted to speak before the hand vote.

The undersigned are sure that the house has but one rule for the settlement of the same question. And the house has decided, in the case of Rowley, at this session, that a knowledge of the wish of the person, desirous to be heard in town-meeting, must be brought home to the selectmen, to be material. Here it is only brought home in the case of Mr. Nowell, and that after the hand vote to dissolve the meeting. Will the house adjudge the town of Chelsea to have committed fraud upon such evidence ?

2. As to the *tumult*.   The evidence is in some respects contradictory; but the weight of it proves that the tumult was after the meeting had been dissolved, and when the votes were being received for the sitting member.   Mr. Slack describes the meeting at that point of time like the 'meeting of Ephesus;' but he also states that before the votes were put and declared, there was no more confusion than he has seen on former occasions at meetings in Chelsea.   Mr. George C. Stearns, one of the most intelligent witnesses examined, testifies that there was sufficient stillness in the hall when the motions were put for any one to speak who desired to.   Mr. Benjamin T. Martin swears that the meeting was as quiet as he ever saw a meeting in Chelsea, on the question to reconsider; and even the testimony of Mr. Darius A. Martin, the witness above referred to, leaves no doubt that the meeting fully understood the questions.   He says: 'The chairman, I think, stated the question to the meeting.   He then gave them to understand what the vote was.'   The undersigned are clearly of opinion, that the weight of evidence shows, that the confusion arose from the fact, that the whig party were dissatisfied with the votes to reconsider and dissolve, and it consisted in their expression of that dissatisfaction after the votes had passed; and subsequently in the dissatisfaction of the democrats that the polls were opened for representative after the meeting was ended.

In closing their remarks on this point, the undersigned invite the special attention of the house to the evidence touching the fact that no one urged, as a reason for the illegality of the votes to reconsider and dissolve, at the time, that persons had not been permitted to speak to those questions.   In our opinion, it is proved beyond all controversy, that this is entirely an after-thought.   Up to the time of the meeting of the legislature, it was placed solely on the ground, that the votes were not within the competency of the town to pass upon, inasmuch as no article to reconsider was put into the warrant. The sitting member placed the issue there; one witness says he has battled it day in and day out on that ground, and never

heard of any other.   The famous speech of Mr. Gould, made after the dissolution, related solely to the fact, that no article was in the warrant; and the legal opinion of Mr. Hallett, written on the evening of the election, which was designed to cover the case, and, undoubtedly, to influence the action of the selectmen in regard to the certificate, has not a word on the subject of uproar, fraud, or violence.

Before adopting a rule fraught with such evil consequences, the undersigned pray the house to pause.   A town may meet and vote to send a representative.   The people go into the election, and a member is returned to this house, having a large majority of the votes.   A citizen of the town may come before the committee on elections with a lie in his mouth, and, like Darius A. Martin, whom nobody ever heard address the chair, and who could not recollect himself that he ever did till the day after his first examination, swear that he attempted to speak on the vote to send a representative, and that he was not permitted to be heard; and on that evidence the election is vacated.   What becomes of the corporate rights of the towns in this Commonwealth under such circumstances?

Nor is this all.   The vote of a town appropriating money, should the court adopt the rule, may be set aside for the same reason, and taxes never could be collected.   In short, no town business could ever be legally transacted.

3. *Violence.*   The undersigned have carefully attended to the evidence, written it out at length, re-written the greater part of it, and read the whole over and over again, but have nowhere found anything like violence to person or rights, if anything further is intended than we have noticed under the preceding allegations.   And were it not for the high estimation in which we hold the character of the counsel for the petitioners who made the allegation, and for our regard for our colleagues of the committee who have endorsed it, we should feel constrained to conclude, that it was intended rather to give rotundity to a period, than as a serious charge to be proved.

The true state of this case the undersigned believe to be

this: the democrats had two candidates on the 14th of November—Mr. Bent and Mr. Brownson,—and failed of an election. On Friday evening preceding the 28th, the party met, and, dropping both of these candidates, agreed upon a third, Mr. Gay. On the following morning, one of the supporters of Mr. Bent, who was unfriendly to the election of Mr. Gay, expressed dissatisfaction that Mr. Bent had been dropped, and endeavored to enlist others with him to oppose the election of Gay; three or four others joined with him in a determination to dissolve the meeting, but, on the same day, abandoned the determination, and prepared votes for Mr. Bent. The mass of the party prepared tickets for their candidate, and made other preparations for the election. The unusual interest which was everywhere felt in the elections of that day, and in which they participated, brought them early to the polls. Finding the friends of Mr. Bent unwilling to drop him and go for Mr. Gay, and despairing of any choice without such union, they determined, on the spot, with a solitary exception, to dissolve the meeting without going into an election; and to insure legality in their proceeding, first reconsidered the vote of a former meeting. One of the selectmen, originally opposed to the vote to dissolve, readily consented to open the polls for representative; the other, intimidated by demands from persons to vote at his 'peril,' and by other menaces, yielded acquiesence. The third selectman, though introduced by the sitting member and sworn, was never called to the stand.

In conclusion, the undersigned submit :—

1. A town has the corporate right to vote not to send a representative, and may lawfully exercise that right under an article in the warrant ' to choose a representative.'

2. The proper time for exercising such right is after reading the warrant and before proceeding to ballot.

3. When a meeting has been declared to be dissolved by the chairman, and that decision affirmed by a majority of the voters present, all proceedings are concluded.

In view of which the undersigned recommend the adoption of the following order :—

Ordered, That the seat of Hosea Ilsley, the sitting member from Chelsea, be declared vacated."

The report of the committee was first amended, by substituting for the conclusion thereof the conclusion of the minority, and then as amended, the same was agreed to, and it was, accordingly—Ordered, That the seat of Hosea Ilsley, the sitting member from Chelsea, be declared vacated.[1]